In The



Court of Appeals



Ninth District of Texas at Beaumont


________________



NO. 09-08-00090-CV


 _____________________



ELMER HANNA, JOYCE HANNA, COLTON HUMBLE, AND LEE HUMBLE; 


AND ELMER HANNA A/N/F OF CALEB HUMBLE AND AUTUMN HUMBLE;


AND ELMER HANNA AS REPRESENTATIVE OF THE 


ESTATE OF CASSANDRA HUMBLE, Appellants



V.



IMPACT RECOVERY SYSTEMS, INC., JOHN THOMAS, INC.,


AND TEXAS DEPARTMENT OF TRANSPORTATION, Appellees






On Appeal from the 172nd District Court


Jefferson County, Texas


Trial Cause No. E-173,443







OPINION


 Appellants are Cassandra Humble's parents and children. They sued Impact Recovery
Systems, Inc., the Texas Department of Transportation, and John Thomas, Inc. The plaintiffs
allege Humble's death was caused by a curb dividing lanes of traffic. The trial court granted
a plea to the jurisdiction filed by the Texas Department of Transportation (TxDOT), and
granted motions for summary judgments filed by Impact Recovery and John Thomas, Inc.
The appellants raise four issues. We affirm the trial court's judgment.

The Accident


 Cassandra Humble was a passenger on a motorcycle. Gerry Hernandez, the
motorcycle driver, attempted to change lanes from the freeway service road to the parallel
lane used by traffic exiting the freeway. The accident occurred about 2:40 a.m., after
Hernandez and Humble left a night club. Hernandez testified as follows:

 Q. [Attorney] And then what happens?

 A. [Hernandez] Then as I came to where the [Highway]105 exit is, I
started moving to the left because going toward Kountze, I was going
to have to get into the left lane -- to get onto 69/96/287. And I got to
where I felt the end of the barrier was and I was looking over my
shoulder and went to move over and -- and I -- there was no signs there. 
I mean, I didn't -- I thought I was -- you know, I thought I was at the
end of it; and obviously I wasn't." 

 . . . .

 Q. And that very night before you made your lane -- attempted lane
change, did you see any kind of barrier whatsoever that separated the
exit lane from the rest of the feeder road? 

 A. Yes, sir, I seen the barrier. 


While attempting to make the lane change, Hernandez struck the divider between the two
lanes. He lost control, and the motorcycle crashed. Thrown from the motorcycle, Humble
sustained serious injuries and died approximately ten hours later.

 The divider between the lanes was a Dura-Curb lane separator system manufactured
by John Thomas, Inc., sold and marketed by Impact Recovery, and purchased and installed
by TxDOT. Within two days after the accident, TxDOT ordered vertical delineator panels
for attachment to the curb base. Appellants contend the accident would not have happened
if the delineators had been in place at the time of the accident. 

The Location's History


 Initially, only double white lines separated the freeway exit lane from the service road
lane. Accidents occurred at that location because drivers coming down the exit ramp lane
were crossing the double white lines onto the service road and attempting to turn on to a side
street or into the parking lot entrance to a store. Traffic would back up on the exit ramp
while drivers waited to make the turn. To alleviate the problem, TxDOT decided to install
delineator poles between the lanes. Resembling white PVC pipe, the poles were on
individual bases epoxied to the pavement between the two lanes; the poles were there for two
or three years. 

 At that time no curb separated the lanes -- just the posts and white lines. The
delineator poles were a maintenance headache, because they were knocked down and would
have to be replaced. Sometimes "the base itself would come loose and be loose on the
highway." Unhappy with the delineator poles because of the maintenance issues and the
danger to employees when replacing them, TxDOT was "constantly looking for something
to put there[.]"

 Duane Browning, a civil engineer for TxDOT, supervised the maintenance, design,
and construction of roadways in this district. Bob Magers, an Impact Recovery salesman,
told Browning of an available product that Browning "thought would be effective in
accomplishing the goal that [TxDOT was] trying to accomplish." Before Magers made the
sales call, TxDOT was contemplating some modification or change that would eliminate the
delineator posts and involve some type of curb system. 

 Browning described the Dura-Curb product as a "mountable curb" system. Its
purpose was "to discourage motorists from going from one lane to the other, the same as the
double white stripe would do without the curb." The curb base was bolted to the roadway
between the two lanes. 

 Impact Recovery manufactured vertical panels that would attach to John Thomas,
Inc.'s curb base. Browning indicated Magers did not recommend use of the posts with the
curb base, and he told Browning there was no requirement to use the delineators on the curb
system. The items could be purchased separately. Browning also testified he considered the
use of the delineators optional based on certain "may" language in the product brochure.

 Browning made the engineering decision to use the Dura-Curb product without any
posts. He indicated he did not rely solely on his conversation with Magers. A number of
factors contributed to the decision to use only the Dura-Curb base. The main reason was that
the vertical panels TxDOT had been using at the location were being knocked down
frequently.

 In Browning's opinion, the decision to use the prefabricated curb was a prudent
engineering decision and one within his discretion as an engineer for the State of Texas. He
was not aware of any federal regulation or any standard within the industry, either
government or private, that had a set of criteria specific to motorcycles. 

 Although Browning indicated he was not bound by the manufacturer's 
recommendations, he "would not have ignored the instructions" and "would have considered
the instructions and the guidance to make an engineering decision." As he explained, "I
would heavily weigh the manufacturer's recommendations and instructions; but I would not
rely on the manufacturer to do engineering that I think would be my responsibility to do." 
He testified: "That is a judgment decision. It was my judgment that placing that curb as it
was placed did not pose an unreasonable risk to the ordinary motorist." 

 Browning discussed the placement of this Dura-Curb, a "fairly new product," both
with and without delineators or object markers, with a TxDOT traffic operations engineer. 
The consultation was one of the things Browning took into consideration in making his
decision. Browning also explained that, to his knowledge, the only area application of the
Dura-Curb was at this location, but there were "an infinite number of curbs placed -- at
ramps, on frontage roads." 

 John Pitre, TxDOT's area maintenance supervisor, testified TxDOT had considered
other solutions to the difficulties posed by this location. A concrete barrier was one
possibility, but that type barrier was too wide and would intrude into the lanes. Another
possibility considered was a concrete curb, but that kind of curb was too narrow and tended
to break off easily. Pitre and Browning indicated TxDOT was constantly looking for
something else to deal with this problem location. He explained that TxDOT ordered the
Dura-Curb base system, as well as the mechanism that would allow attachment of a
delineator panel to the base. Pitre "wanted the option to add the panels if [TxDOT] thought
they were necessary." As to whether the posts should or should not be used, Pitre indicated
he was not looking to Magers, Impact Recovery's salesman, to give him advice. "[T]hat
would be TxDOT's call."

 In describing the sales call conversation, Pitre explained that "it was given to us that
these [delineator panels] were an optional part of the system. . . . On the original demo -- I
mean the unit that Bob Magers came -- there was no way to attach a panel to it. We had to
order those separate. . . . [from] Impact Recovery." 

 Q. Would it be fair to say then that the only thing that he told you is that:
Listen, you don't have to buy these panels, any kind of delineators. You can
just buy this 40-inch section, put it down; and that's all y'all -- you know, I
mean is that pretty fair? 

 A. [Pitre]: Not entirely because it's assuming that he deliberately told us that
we did not have to use them. It was not that way at all. It was more: This is
a system, and you can use it with or without panels. 


Pitre indicated that no one from Impact Recovery informed him that TxDOT should use the
delineators and that Magers stated the Dura-Curb system could be used without delineators
of any type. 

 Pitre indicated Magers's statement was a "very crucial" representation in the final
decision to use the system. If Impact Recovery had said TxDOT needed to use delineators
with Dura-Curb, Pitre explained, "I think it's safe to say we would have taken a longer time
to reach a decision pro or con." Yet Pitre also indicated that, in his opinion, having the
delineator panels up there would not have made that particular area any safer.

 Q. Was there any time that you were looking to Impact or Bob Magers to
advise you as to the appropriateness of using panels or posts in this
location? 

 A. No, we did not request them to -- to do that. It is, I think, a fair
assumption to say that if he thought it would have been a dangerous
situation to use without it, he would have so informed us; but we didn't
specifically ask him, no -- at least, I didn't.

 Q. And do you believe that it was still a proper discretionary call for
TxDOT to have installed the Dura-Curb without posts or delineators?

 A. Definitely because we have. . . . we have similar installations made out
of stuff other than Dura-Curb everywhere else. So . . . what it's made
out of is immaterial. 


TxDOT began installing the Dura-Curb system around August 11; with the exception of
finishing bolting down the last few sections, TxDOT finished the installation the day before
the accident. (1)
 

 Bob Magers, a civil engineer and the sales representative for Impact Recovery, 
testified Impact Recovery manufactured the vertical panels or the risers that fit onto the curb
manufactured by John Thomas, Inc.; Impact Recovery also marketed the Dura-Curb system. 
In March 2004, Magers, a former TxDOT employee, made the sales call on TxDOT and
presented the Dura-Curb system. His presentation materials -- photographs and brochures --
showed the curb system being used with delineator panels. Magers testified he could not
remember whether he recommended the Dura-Curb system without use of delineators or
vertical panels. He explained, "I don't think I said either way. I presented him with pictures
of what we had done across the rest of the state of Texas where they all show the panels on
them . . . but I had made no recommendations, no."

 Magers acknowledged the product brochures did not discuss potential hazards
associated with the Dura-Curb system when used without delineators; he indicated the
brochures did not state whether the customer should or should not use the delineators. The
brochure contained the following phrase: "[a]ny of the . . . optional devices: vertical panels,
delineators, tubular markers. . . ." Magers explained this language meant that "it's up to the
engineer what he wants to use. . . . What the thing is saying is: Any of the optional devices
which you may want to use, you can do it quickly." At one point, Magers testified, "It would
have been inappropriate for me to make a recommendation, period. I'm not the engineer." 
"It's not my job to recommend to the engineers how they should use it -- what they should
use or not use." When asked if he pointed out to either Pitre or Browning that it was optional
whether to use delineators, Magers stated, "No, no. I did not."

 Magers testified he knew TxDOT was attempting to solve the maintenance problems
it had been experiencing with the vertical poles that had been in place prior to the Dura-Curb
system. When asked if TxDOT's purchase of the Dura-Curb system without the delineator
panels (manufactured by Impact Recovery) raised red flags for him, Magers responded "I am
not the engineer on the job up here." He further stated, "That is their engineer's judgment
how it's to be used. . . . . I say, once again, I'm not going to question their judgment up here. 
These are competent engineers. This is what they ordered, and this is the way it is." Magers
also testified:

 Q. [Hernandez's attorney]: Do you ever recall telling them it wouldn't
make any difference or it's okay just to buy the curb without the
panels? 

 A. [Magers] I don't recall that either.

 . . . .

 Q. If somebody says that you did, would you dispute that?

 A. Probably not. 


Magers testified repeatedly that he did not remember what he said in that regard. 

 Magers agreed that the visibility of the curb would be enhanced if vertical delineators
had been installed on it, but he did not know whether the curb system would be safer. 
Magers further indicated that John Thomas, Inc. never provided any training to him, or to his
knowledge to any other Impact Recovery employee, concerning safe and unsafe uses of the
system or proper and improper uses of the product. He also indicated that no one at John
Thomas, Inc. instructed him that the Dura-Curb product should be sold with some type of
delineation.

 In its interrogatory answers, John Thomas, Inc. explained that the inlaid divider
system and delineators are designed and marketed as a combined system. The company
stated that generally it is not acceptable to use the Dura-Curb product without delineators as
a lane separator in a high-traffic area with a posted 45 mile-per-hour speed limit. "[An]
inlaid divider system requires delineators to create proper visibility for the raised object
installed on the road." Another interrogatory response explained, "[I]t would be more visible
and presumably safer if delineators had been used at the location where the incident in
question occurred." The product "is designed to be used in conjunction with delineators." 

 John Dvorak, the majority stockholder in John Thomas, Inc., testified about the Dura-Curb product. The following exchange occurred:

 Q. [Plaintiff's attorney] [Would you agree] If a salesman represented that
the Dura-Curb base model only, without delineators, could be safely
used in a highway setting -- for example, like the one that you looked
at this morning in front of Academy [?] 

 A. [Dvorak]: Well, I would for sure say "no."

 Q. Okay. Would that be a misrepresentation of the intended uses of the
product? 

 A. Anytime it doesn't have a delineator stationed at some point along the
way, it would be a misrepresentation. 

 . . . .

 A. Well, for sure, without delineators, a misuse. 

 . . . .

 A. You know, I make it a point of saying it's a misuse, in my behalf and
the behalf of John Thomas, in what my intentions are when we
designed it and developed it and manufactured it and then provided it. 
But the fact of the matter is it's a product just like a nail, and it . . . you
don't give instructions as to what that nail should go through or
anything else.

 It is up to professional engineers to determine the installation and
the application and the -- the use of our product with or without vertical
delineation. 


Dvorak also indicated he was not saying Magers misrepresented the system. "[I]f it's used
without the full complement . . . of the design and the intent of the curb to be used as a
system with delineator and the high visibility factor, it's just misapplied." He stated he
"would defer to people who have been trained and have some degree of knowledge about
that to make a judgment as to what is best for their - their application. But I would still
strongly, strongly advocate the use of delineation here." 

 David Steitle, consulting traffic engineer, testified as an expert witness. He stated that
the Dura-Curb system without the delineator panels "can be used in that manner but not at
this location." He testified that the curb base, as it was used here without the delineators,
violated the provisions of the Texas Manual on Uniform Traffic Control Devices (MUTCD),
but he also indicated there were no regulations that would have required vertical delineators
to have been used at this location. 

 David Hall, a professional engineer with a specialty in traffic engineering, concluded
John Thomas, Inc.'s brochure was inadequate because it failed to warn TxDOT that the
vertical panels must be used with the Dura-Curb base. Having that information in the
brochure is "critical." He also agreed that TxDOT probably had the expertise to determine
whether vertical panels should be installed in this type of system. Hall indicated this
determination was part of TxDOT's job. "And that's reflected by the fact that in their bid
process they indicate the need for delineators with this type of system." (2) The invitation-to-bid sheet reflected that TxDOT requested, and ultimately ordered, a separator with a
connection for a delineator post to allow TxDOT to install the vertical delineators if needed. 

TxDOT's Plea to the Jurisdiction


 In issue four, appellants argue the trial court erred in granting TxDOT's plea to the
jurisdiction. TxDOT asserted immunity from suit. If a governmental entity is immune from
suit, a trial court lacks jurisdiction. See Tex. Dep't of Transp. v. Jones, 8 S.W.3d 636, 638
(Tex. 1999).

 We review de novo a trial court's ruling on a plea to the jurisdiction. Houston Mun.
Employees Pension Sys. v. Ferrell, 248 S.W.3d 151, 156 (Tex. 2007). A plaintiff has the
burden to allege facts that affirmatively establish the trial court's subject matter jurisdiction. 
See Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993). We
consider the facts the plaintiff alleges and also the evidence the parties submit, to the extent
that the evidence is relevant to the jurisdictional issue. Ferrell, 248 S.W.3d at 156. We
construe the pleadings in the plaintiff's favor and look to the pleader's intent. County of
Cameron v. Brown, 80 S.W.3d 549, 555 (Tex. 2002). If a plaintiff does not plead facts
establishing jurisdiction, but the petition does not affirmatively demonstrate incurable defects
in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded
the opportunity to amend. Id. When the pleadings affirmatively negate the existence of
jurisdiction, a plea to the jurisdiction may be granted even without allowing the plaintiff an
opportunity to amend. Id. 

 The State's immunity from suit for tort claims is waived to the extent the Texas Tort
Claims Act creates liability. Tex. Dep't of Transp. v. Ramirez, 74 S.W.3d 864, 866 (Tex.
2002) (citing Tex. Civ. Prac. & Rem. Code Ann. § 101.025(a) (Vernon 2005)). The Act
provides that a governmental unit is liable for "personal injury and death so caused by a
condition or use of tangible personal or real property if the governmental unit would, were
it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. &
Rem. Code Ann. § 101.021(2) (Vernon 2005); see County of Cameron, 80 S.W.3d at 554. 

 Appellants pled that the accident and Humble's death were caused by the following:

 Special defect - alleging that the property condition fell within this category
under section 101.022(b) of the Texas Civil Practice and Remedies Code. 


 Premises defect - alleging that TxDOT had not installed vertical delineator
posts at the time of the accident and TxDOT had actual knowledge the
product, as installed, was in violation of the Texas Manual on Uniform Traffic
Control Devices (MUTCD).


 Negligent use or condition of tangible personal property - alleging that
TxDOT had improperly installed a product, contrary to sound engineering
practices and contrary to the MUTCD.


 Negligent implementation of policy - alleging that TxDOT failed to use
ordinary care in implementing the discretionary decision to remove the
previously existing barriers; failed to warn of incomplete construction and of
a newly installed divider; and failed to install the vertical delineator posts
pursuant to the manufacturer's installation instructions.


 The Tort Claims Act waives sovereign immunity under certain specified
circumstances for personal injury claims that involve conditions of property. See Tex. Civ.
Prac. & Rem. Code Ann. § 101.021 (Vernon 2005); Tex. Dep't of Transp. v. York, No. 07-0743, 2009 WL 1427185, at *2 (Tex. May 22, 2009). Under the Act, premises liability
claims take two forms -- ordinary premises defects and special defects. See Tex. Civ. Prac.
& Rem. Code Ann. §§ 101.021(2) (Vernon 2005), 101.022 (Vernon Supp. 2008); see also
City of Mission v. Cantu, 89 S.W.3d 795, 807 (Tex. App.--Corpus Christi 2002, no pet.). 
Section 101.022 of the Civil Practice and Remedies Code applies different duties of care
depending on whether the condition is an ordinary defect or a special defect. York, 2009 WL
1427185, at *2.

 Though the Act provides a waiver of immunity for premises defects, the Act also
"includes a subchapter entitled 'Exceptions and Exclusions' listing circumstances in which
its waiver provisions do not apply." City of San Antonio v. Hartman, 201 S.W.3d 667, 671-72 (Tex. 2006) (footnotes omitted). Among those exceptions is section 101.056 concerning
a governmental unit's discretionary acts. See Tex. Civ. Prac. & Rem. Code Ann. § 101.056
(Vernon 2005). "The exception's purpose is to avoid judicial review or interference with
those policy decisions committed to the other branches of government." Stephen F. Austin
State Univ. v. Flynn, 228 S.W.3d 653, 657 (Tex. 2007). Roadway design is a discretionary
act. See Ramirez, 74 S.W.3d at 867 (Governmental unit may not be sued for design of a
public work such as a roadway or for failure to install safety features such as barriers and
guard rails.); State v. Rodriguez, 985 S.W.2d 83, 86 (Tex. 1999). "[S]ection 101.060(a) of
the Act specifically applies this principle [in section 101.056] to traffic control devices, 
preserving sovereign immunity for the decision to install or not install road signs and warning
devices on roads where not mandated by law." Cantu, 89 S.W.3d at 811. 

 At least one court has held that the Act's limited waivers of immunity under premises
defect and special defect theories do not bypass the immunity for discretionary roadway
design under section 101.056 of the Act. See Sanchez v. Matagorda County, 124 S.W.3d
350, 353 (Tex. App.--Corpus Christi 2003, no pet.). Section 101.060(c), however, indicates
that a governmental unit does not retain immunity for failure to warn of "special defects" like
excavations or roadway obstructions. See Tex. Civ. Prac. & Rem. Code Ann. § 101.060(c)
(Vernon 2005); Cantu, 89 S.W.3d at 811-12, n.28. Section 101.022(b) of the Act also
provides that the "limitation of duty in this section [section 101.022(a)] does not apply to the
duty to warn of special defects such as excavations or obstructions on highways, roads, or
streets or to the duty to warn of the absence, condition, or malfunction of traffic signs,
signals, or warning devices as is required by Section 101.060 ['traffic and road control
devices']." Tex. Civ. Prac. & Rem. Code Ann. § 101.022(b). Some courts have held that
the duty to warn of special defects is expressly removed from the exemption created for
discretionary signage. See Villareal v. State, 810 S.W.2d 419, 422 (Tex. App.--Dallas 1991,
writ denied); see also Rodriguez, 985 S.W.2d at 86 (Even if sign placement decisions were
discretionary, State still waives immunity if the detour's alleged defects were special
defects.) (citing Tex. Civ. Prac. & Rem. Code Ann. § 101.060(c) (Vernon 2005)). We need
not decide this issue because we conclude for the reasons we explain below that the condition
of property was not a special defect.

Special Defect 


 The Texas Tort Claims Act does not define "special defect," but section 101.022(b) 
"likens it to 'excavations or obstructions' that exist 'on' the roadway surface." Denton
County v. Beynon, 283 S.W.3d 329, 331 (Tex. 2009) (quoting Tex. Civ. Prac. & Rem. Code
Ann. § 101.022(b)). A special defect cannot be a condition that falls outside that class. York,
2009 WL 1427185, at *2. 

 If a claim involves a special defect, the "State owes the same duty to warn as a private
landowner owes to an invitee, one that requires the State 'to use ordinary care to protect an
invitee from a dangerous condition of which the owner is or reasonably should be aware.'" 
Denton County, 283 S.W.3d at 321 (quoting State Dep't of Highways & Pub. Transp. v.
Payne, 838 S.W.2d 235, 237 (Tex. 1992)). Actual knowledge is not required; the plaintiff
need only prove the governmental unit should have known of a condition that created an
unreasonable risk of harm. York, 2009 WL 1427185, at *2 (citing Payne, 838 S.W.2d at
237). The determination of whether a condition is a premises defect or a special defect is a
question of law. See id. 

 In York, the Supreme Court described characteristics of this class that a court may
consider in determining whether a condition of property is a special defect: 

 Size of the dangerous condition. See County of Harris v. Eaton, 573 S.W.2d 
177, 179 (Tex. 1978) (finding a large hole 6 to 10 inches deep and 4 to 9 feet
wide that covered 90% of the road's width was a special defect);


 Some unusual quality outside the ordinary course of events. See City of Dallas
v. Reed, 258 S.W.3d 620, 622 (Tex. 2008)(finding a two-inch difference in
elevation between traffic lanes on a roadway was not a special defect) (citing
City of Grapevine v. Roberts, 946 S.W.2d 841, 843 (Tex. 1997)(partially
cracked and crumbled sidewalk not a special defect)); 


 Something that "unexpectedly and physically impair[s] a car's ability to travel
on the road." Rodriguez, 985 S.W.2d at 85-86 (finding a 90 degree turn in a
detour from a road construction project was not a special defect.)


 "An unexpected and unusual danger to ordinary users of roadways." Payne,
838 S.W.2d 235 at 238 (finding a culvert beneath a roadway was not a special
defect.) 


York, 2009 WL 1427185, at **2-3. The Court in York concluded that a layer of loose gravel
on a road does not share the characteristics of the conditions in the cited cases and does not
fit within the same class as an obstruction or excavation. See id. 

 Appellants cite City of Dallas v. Reed, one of the cases the Supreme Court referenced
in York. York, 2009 WL 1427185, at **2-3 (citing Reed, 258 S.W.3d at 622). In Reed, a
motorcyclist fell and sustained injuries when he attempted a lane change. See Reed, 258
S.W.3d at 621-22. The Supreme Court found the two-inch "drop-off" between the lanes was
not a special defect. Id. at 621, 623. Appellants distinguish this case from Reed, and argue
a road's natural deterioration is different from the divider encountered by the motorcyclist
here. 

 In Reed, the Supreme Court considered some of the same factors discussed in earlier
cases and focused its analysis on whether the alleged condition presented some unusual
quality outside the ordinary course of events. Id. at 622 (Eaton, 573 S.W.3d at 179, and
Rodriguez, 985 S.W.2d at 85). The Court concluded that there was nothing unusually
dangerous about a slight drop-off between traffic lanes in the roadway. (3) Reed, 258 S.W.3d
at 622. The Court explained that "[o]rdinary drivers, in the normal course of driving, should
expect these slight variations on the road caused by normal deterioration." Id. The Court
concluded that "to construe a two-inch drop-off to be within the same kind or class as an
excavation or obstruction would 'grossly strain[] the definitions of those conditions.'" Id. 
(quoting City of Grapevine, 946 S.W.2d at 843). 

 In a case decided by the Tyler Court of Appeals, a bicyclist hit a bump on the highway
shoulder and was thrown from his bike. See Hindman v. State Dep't of Highways & Pub.
Transp., 906 S.W.2d 43, 43-44 (Tex. App.--Tyler 1994, writ denied). Perpendicular to the
highway, the bump on the shoulder was 2 ½ feet long, 1 foot wide, and 2 ½ inches tall; the
bump occupied the center of a ten-foot-wide shoulder. Id. at 44. Affirming the trial court's
grant of summary judgment, the Twelfth Court of Appeals concluded as a matter of law the
bump was not a special defect. Id. at 45. The bump was not an obstruction since the bump
occupied only about one-third of the width of the shoulder and allowed safe passage on either
side. Id. The court further found the bump was not an unexpected or unusual danger. Id. 
Under an objective test, the court stated that this imperfection in the road shoulder was a
condition that a cyclist could and should anticipate when riding on a shoulder. Id. 

 Unlike Reed and Hindman, this case does not involve a bump on the shoulder or a
natural deterioration of the highway. The Dura-Curb system is a traffic control device that
TxDOT employed as part of its roadway design to resolve a highway safety issue. We
consider nevertheless what characteristics of the curb appellant claims should put it in the
class of a special defect. Appellants point to the use of the word "obstruction" by Duane
Browning, TxDOT's engineer, and argue his use of the word establishes the system was a
special defect. During deposition testimony, Browning used the word "obstruction" in
explaining whether the delineator panels made the "mountable curb system" more or less
visible. He stated, "The vertical panels actually probably make the curb itself less visible;
but it makes the -- the obstruction, if you will, more visible." "There is a physical separation
that doesn't exist with just striping when you place the Dura-Curb." 

 The curb provided some physical barrier between the lanes. That fact, along with
Browning's use of the word "obstruction," is insufficient to establish the curb was a special
defect, however. The curb was a lane separator system employed by TxDOT to discourage
vehicles driving down the freeway's exit ramp from turning onto streets or into business
entrances off the service road at the point where the exit lane and frontage road initially
converged. The curb was not placed in the individual lanes of traffic; it separated the lanes
and was not intended to intrude into either lane. The Dura-Curb was not hidden or obscured
from the motorcyclist's vision. Its purpose was not to prevent ordinary travelers from using
the road, but rather to encourage safe use of the road. When a freeway exit lane joins another
lane in a parallel fashion, an ordinary user of the highway would not find it unexpected or
unusual to encounter some type of divider separating the lanes. In this case, Hernandez
testified he saw the barrier that night, and only attempted to change lanes after he thought the
barrier ended. That he was mistaken about where the curb ended does not mean the existence
of the lane divider at that location was a dangerous condition posing an unreasonable risk of
harm to ordinary users of the roadway. To the contrary, Hernandez expected and saw a lane
separation. The pleadings and the relevant evidence affirmatively negate the existence of a
special defect in this case.

The Remaining Claims Against TxDOT


 No matter how they are cast, appellants' remaining claims against TxDOT -- ordinary
premise defect, negligent misuse of tangible personal property, and negligent implementation
of policy -- all have to do with the discretionary design of the roadway. (4) The decision to
remove the previous vertical delineators and replace them with the Dura-Curb system was
an intentional design decision. As we have noted, the "[d]esign of any public work, such as
a roadway, is a discretionary function involving many policy decisions, and the governmental
entity responsible may not be sued for such decisions." Rodriguez, 985 S.W.2d at 85; see
also Ramirez, 74 S.W.3d at 866-67 (citing Tex. Civ. Prac. & Rem. Code Ann. § 101.056(2)
[Vernon 2005])). Further, "decisions about installing safety features are discretionary
decisions for which the State may not be sued." Ramirez, 74 S.W.3d at 867; see also State
v. San Miguel, 2 S.W.3d 249, 251 (Tex. 1999) (Decision to warn of a missing guardrail with
barrels and signs is discretionary.); see also County of Cameron, 80 S.W.3d at 554 ("[T]he
Act does not waive immunity for discretionary decisions, such as whether and what type of
safety features to provide."). 

 Appellants argue that TxDOT created a dangerous premises defect by using the Dura-Curb without the vertical delineators, and they assert that TxDOT's use of the curb without
vertical posts did not comply with the MUTCD. The discretionary act exemption does not
apply when the government unit is required by law to perform an act. See Tex. Civ. Prac.
& Rem. Code Ann. § 101.056(2) (Vernon 2005). The MUTCD does not establish a
mandatory duty by TxDOT to install particular traffic control devices. Tex. Dep't of Transp.
v. Andrews, 155 S.W.3d 351, 359 (Tex. App.--Fort Worth 2004, pet. denied) (citing State
Dep't of Highways & Pub. Transp. v. King, 808 S.W.2d 465, 466 (Tex. 1991)); Cantu, 89
S.W.3d at 806-07 & n.17; Bellnoa v. City of Austin, 894 S.W.2d 821, 824 (Tex. App.--Austin
1995, no writ). Appellants' premises defect claim involves roadway design, a discretionary
function. See Ramirez, 74 S.W.3d at 866-67; Rodriguez, 985 S.W.2d at 85. There is no
waiver of immunity. 

 Appellants also allege TxDOT waived immunity through misuse of tangible personal
property by installing the curb without the vertical posts and by failing to install all the bolts
in the last two curb sections. Appellants' experts have acknowledged the missing bolts in
the last two sections were not a factor in the accident. The decision to not use the vertical
posts was a discretionary act decision and immune under the Act. See Tex. Civ. Prac. &
Rem. Code Ann. § 101.056; Ramirez, 74 S.W.3d at 867. 

 Appellants also allege TxDot waived immunity under the Act through negligent
implementation of policy -- by deciding to take down the existing traffic control devices and
"not replac[e] them with a properly installed device and in failing to warn of the condition."
This theory relates, like the ordinary premises defect and misuse theories, to roadway design
in this case. 

 We conclude the trial court did not err in granting TxDOT's plea to the jurisdiction. 
Issue four is overruled. 

 Causes of Action Against Impact Recovery and John Thomas, Inc.


 Appellants sued both Impact Recovery and John Thomas, Inc. asserting strict products
liability and breach of warranty. The petition also alleged Impact Recovery was
independently liable for defective and negligent marketing, fraud, negligence, negligence per
se, and gross negligence by representing to TxDOT that the Dura-Curb system could be used
without delineator panels. Against John Thomas, Inc., appellants pled negligence in failing
to properly train its distributor (Impact Recovery) in the proper and improper uses of the
Dura-Curb product. Appellants pled that John Thomas, Inc. and Impact Recovery are jointly
and severally liable under theories of joint manufacturer and joint enterprise.

 Essentially, as with their claim against TxDot, appellants argue that the Dura-Curb
system installed at this location should have included delineator panels attached to the base
system. Appellants argue that the manufacturer and distributor should not have sold the
product without the panels and should not have represented that the product could be used
without the panels. 

The Summary Judgments


 In issues one and three, appellants attack the summary judgment granted in favor of
Impact Recovery and John Thomas, Inc. In issue two appellants contend the trial court erred
in denying their motion for summary judgment against Impact Recovery. Impact Recovery
and John Thomas, Inc. filed both traditional and no-evidence motions for summary judgment.
For a traditional summary judgment, the standard of review is whether the moving party
carried its burden of showing that there is no genuine issue of material fact and that judgment
should be granted as a matter of law. Shah v. Moss, 67 S.W.3d 836, 842 (Tex. 2001) (citing
Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991)); see Tex. R. Civ. P. 166a(c). 
The party moving for summary judgment must conclusively prove all elements of its cause
of action or defense as a matter of law. Holy Cross Church of God in Christ v. Wolf, 44
S.W.3d 562, 566 (Tex. 2001). A defendant moving for summary judgment must disprove
at least one of the essential elements of the plaintiffs' causes of action to prevail. Elliott-Williams Co., Inc. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999) (citing Science Spectrum, Inc. v.
Martinez, 941 S.W.2d 910, 911 (Tex. 1997)). Once the movant produces evidence entitling
it to summary judgment, the burden shifts to the non-movant to present evidence that raises
a fact issue. Phan Son Van v. Pena, 990 S.W.2d 751, 753 (Tex. 1999). We view the
evidence in the record in the light most favorable to the non-movant and resolve all doubts
against the movant. Shah, 67 S.W.3d at 842. 

 In a no-evidence motion for summary judgment, the movant contends there is no evidence of one or more essential elements of the claims for which the non-movant bears the

burden of proof at trial. Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008); see Tex. R.
Civ. P. 166a(i). The non-movant does not have to marshal its proof; its response need only
show evidence that raises a fact issue on the challenged elements. Hamilton, 249 S.W.3d at
426. Unless the non-movant produces summary judgment evidence that raises a genuine issue
of material fact, the trial court must grant the no-evidence motion. Id. 

 Appellants challenge the no-duty ground in the traditional motions for summary
judgment granted in favor of Impact Recovery and John Thomas, Inc. Whether there is a
duty to warn of dangers or instruct on the safe use of a product is a question of law. Am.
Tobacco Co. v. Grinnell, 951 S.W.2d 420, 426 (Tex. 1997). "Generally, a manufacturer has
a duty to warn if it knows or should know of the potential harm to a user because of the
nature of its product." Id.; see also Wood v. Phillips Petroleum Co., 119 S.W.3d 870, 873
(Tex. App.--Houston [14th Dist.] 2003, pet. denied). A manufacturer also has a duty to
instruct users on the safe use of its product. Woods, 119 S.W.3d at 873. However, no duty
exists to warn of obvious risks, and "[a] risk can be obvious to those who have special
training." Brocken v. Entergy Gulf States, Inc., 197 S.W.3d 429, 436 (Tex. App.--Beaumont
2006, no pet.). 

 TxDOT employed engineers to make engineering decisions concerning the design and
selection of traffic control systems. Browning testified he made the engineering decision to
use the Dura-Curb base product as part of the roadway at this location. He consulted a
TxDot traffic operations engineer. As a civil engineer for TxDOT, Browning explained it
was within his discretion to decide whether to use the product without the delineators.

 Sections 101.056 and 101.060 of the Texas Civil Practice and Remedies Code give
TxDOT the discretion to make determinations concerning traffic and road control devices.
See Tex. Civ. Prac. & Rem. Code Ann. §§ 101.056, 101.060. The TxDOT employees
making the decision to use the Dura-Curb product had special training and also prior
experience with different types of lane separators at this location. The possible risk of using
the product without delineators would have been known and obvious to TxDOT. See, e.g.,
Humble Sand & Gravel, Inc. v. Gomez, 146 S.W.3d 170, 183 (Tex. 2004) (When the
foreseeable users of the product have special training, a supplier has no duty to warn of risks
that should be obvious.). We conclude, under the circumstances, Impact Recovery and John
Thomas, Inc. had no duty to warn or instruct TxDOT regarding the selection and application
of the traffic control system at this location. See id; see generally Brocken, 197 S.W.3d at
436 ("No duty to warn exists where a user is already aware of the risk or the risk is
obvious."). 

 Additionally, Impact Recovery's no-evidence motion asserts there is no evidence that
it committed "actionable fraud," and there is no evidence of "causation. (5) See generally Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006) (causation as element of negligence,
misrepresentation, breach of warranty, and of design, manufacturing, and marketing defects);
Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47
(Tex. 1998) (reliance and causation elements in fraud); In re FirstMerit Bank, N.A., 52
S.W.3d 749, 758 (Tex. 2001) (reliance and injury elements) (citing Formosa, 960 S.W.2d at
47). "Causation-in-fact is common to both proximate and producing cause . . . ." Tamez, 206
S.W.3d at 582 (citing Union Pump Co. v. Allbritton, 898 S.W.2d 773,775 (Tex. 1995)); see
also Goodyear Tire & Rubber Co. v. Rios, 143 S.W.3d 107, 116 (Tex. App.--San Antonio
2004, pet. denied). Generally, to be a legal cause of an injury, the act or omission
complained of must have been a substantial factor in bringing about the injury, and without
which the injury would not have occurred. Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 46
(Tex. 2007). Causation is not established when the act or omission "does no more than
furnish a condition which makes the injuries possible." IHS Cedars Treatment Ctr. of
Desoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 799 (Tex. 2004). Conduct too attenuated from
the resulting injuries is not considered to be a "substantial factor in bringing about the
harm[,]" and so is not a legal cause. Id. 

 Plaintiffs submitted summary judgment evidence that Bob Magers, Impact Recovery's
salesman, represented to TxDOT that the Dura-Curb product could be used with or without
any vertical delineators. The representation had to do with the capabilities of the product. 
Browning and Pitre testified they considered Magers's representation regarding the product's
capabilities in their decision to purchase and place the Dura-Curb at the location. The
engineering decision of how to apply the product to this roadway was TxDOT's. Browning
and Pitre made clear that the application of the Dura-Curb to this highway was their
responsibility and, though they considered Magers's statements, they alone made the
engineering decision to apply the product in this manner and did not rely on the product
seller's representation. The risks and benefits of the application were known to TxDOT. We
see no evidence of fraud.

 Furthermore, the conduct complained of is too attenuated to be considered a legal
cause. On the night of this accident, before attempting to change lanes, the motorcycle driver
was aware of the existence of the lane divider. He testified he thought he was past the
divider:

 Q. [Attorney]: You didn't intend to go over the hump?

 A. [Hernandez]: My belief was I thought I was past it.

 Q. Okay. So, you made the mental calculation in your mind of whether
you were going to be past the barrier or not when you actually made the
turn to the left?

 A. I thought I was past it, yes, sir, and went to make a lane change, yes, sir.

 Q. And just made an error in judgment and made the left change too soon?

 A. Yes, sir.


Considering the circumstances of the accident, the conduct complained of, and TxDot's
expertise, we conclude appellant did not raise a fact issue on causation. 

 Appellants also argue the trial court improperly prevented introduction of the
deposition of Greg Hannah, a representative of Impact Recovery. The deposition was not
filed with or attached to appellants' response to Impact Recovery's motion for summary
judgment. We find no motion in the record asking the trial court to consider the deposition
prior to the trial court's granting of the summary judgment motion, and appellants do not
direct us to its location in the record. In their motion for new trial, appellants referred to the
deposition and filed a pleading certifying that they filed the deposition in support of the
motion for new trial. The record does not reflect the deposition was filed with the motion. 
Later, appellants attached the deposition as an appendix to their appellate brief. The
supplemental clerk's record reflects the deposition was filed October 29, 2008, after the
filing of appellants' brief. We find nothing in the record to support appellants' assertion that
the trial court prevented introduction of the deposition before granting the summary
judgment. See Mello v. A.M.F. Inc., 7 S.W.3d 329, 331-32 (Tex. App.--Beaumont 1999, pet.
denied) (Record did not support assertion that trial court granted leave to supplement the
evidence and authorities opposing the summary judgment.). The deposition was not part of
the record before the trial court at the time it granted summary judgment, and we may not
consider it. See Benchmark Bank v. Crowder, 919 S.W.2d 657, 663 (Tex. 1996) (Where
nothing appears of record to show that late filing of summary judgment response was with
court's permission, it is presumed trial court did not consider it.). 

 Finally, appellants contend that the motions filed by Impact Recovery and John
Thomas, Inc. did not address all their causes of action. Throughout the record, appellants'
central claim was that the two companies represented to TxDOT that the use of the
delineators with the Dura-Curb system was optional. We conclude that their motions for
traditional summary judgment and no-evidence summary judgment covered all of appellants'
causes of action. Appellants' claims of apparent manufacturer and joint enterprise liability
are not separate causes of action. See generally SSP Partners v. Gladstrong Invs. (USA)
Corp., 275 S.W.3d 444, 456 (Tex. 2009) (apparent manufacturer); Seureau v. ExxonMobil
Corp., 274 S.W.3d 206, 218 (Tex. App.--Houston [14th Dist.] 2008, no pet.) (joint
enterprise). Appellants assert the trial court erred in denying their own motion for summary
judgment. For the same reasons the trial court did not err in granting appellees' motions for
summary judgment, the trial court did not err in denying appellants' motion. 

 We overrule issue one, two and three. The trial court's judgment is affirmed. 

 AFFIRMED. 

 ____________________________

 DAVID GAULTNEY

 Justice


Submitted on March 5, 2009

Opinion Delivered August 27, 2009


Before Gaultney, Kreger, and Horton, JJ.
1. At one point in their brief, appellants state that TxDOT's employees knew the curb
was installed without all the necessary hardware -- leaving two curb sections with missing
bolts -- and that this misuse of tangible personal property was a contributing cause of the
accident. However, appellants' expert (David Steitle) did not consider the lack of bolts on
those sections a factor contributing to the accident. Similarly, appellants' expert ( David
Hall) testified although there was "a possibility," he could not say with reasonable
engineering probability that the loose panel was the reason Hernandez lost control of the
motorcycle. At oral argument in this Court, appellants' counsel explained the missing bolts
were not an issue.

2. Appellants refer to the second page of the invitation-for-bid sheet which states that
"[t]his bid . . . is for 360 feet of railroad median separator with delineators, arched reflectors,
end sections, and all necessary hardware for complete installation." Although the second
page of both documents (invitation-for-bid and purchase order) referenced delineators, the
signed first pages of these documents do not include delineators -- only the connectors for
the delineators. Regardless, the TxDOT engineer made the decision to use a system without
delineators. 
3. In Denton County, the Supreme Court explained in a footnote that the Texas Tort
Claims Act says nothing about "unexpected and unusual danger" as a stand-alone
requirement for special defect. Denton County, 283 S.W.3d at 331-32, nn. 11,15. "[T]he
statutory test is simply whether the condition is of the same class as an excavation or
obstruction." Id. at 322 n.11. 
4. See supra note 1. 
5. Impact Recovery's no-evidence motion for summary judgment also asserted there
was no evidence of negligence per se. Appellants pled Impact Recovery was negligent per
se in representing to TxDOT that the delineators were optional when, in fact, they were
required by MUTCD. We have already determined that TxDOT did not violate MUTCD in
failing to install the delineators prior to the accident. There is no evidence supporting the
negligence per se claim.